IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JO TANKERS, A.S. and JO TANKERS B.V., §<br>Plaintiffs, §<br>§<br>v. §<br>§<br>HBG LOGISTICS, L.L.C., HB GLOBAL §<br>LOGISTICS, L.L.C., HOUSTON BECNEL, §<br>INC., ALBERT GARCIA, and JULIAN §<br>HOWARD, §<br>Defendants, §<br>§<br>v. §<br>§<br>JOE L. DAUGHTRY, §<br>Third-Party Defendant. § | C.A. No. 11-CV-00938<br>ADMIRALTY 9(h) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried by consent of the parties in a bench trial before the Court. Plaintiffs Jo Tankers AS and Jo Tankers B.V., Defendants H.B. Global Logistics, L.L.C., Houston Becnel, Inc., and Albert Garcia appeared by and through their counsel of record. Defendant Julian Howard and Third-Party Defendant Joe Daughtry both appeared pro se. The Court, having carefully considered the evidence admitted at trial and the stipulations made on the record during the trial, now makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

1. Defendant H.B. Global Logistics, L.L.C. is a Texas Limited Liability Corporation, and it is often referred to by its unregistered d/b/a of HBG Logistics ("HBG Logistics"). HBG Logistics is a ship-husbanding agent located in Houston, Texas.

2. The sole member of HBG Logistics is Defendant Albert Garcia ("Garcia.") At the time HBG Logistics began operations in 2008, Defendant Julian Howard ("Howard") was its

President, Third-Party Defendant Joe L. Daughtry ("Daughtry") was its Vice-President and Garcia served as its Treasurer.

3. Defendant Houston Becnel, Inc. ("Houston Becnel") is a customs brokerage firm located in Houston, Texas. Houston Becnel is a Texas Corporation

4. The sole shareholder of Houston Becnel is Garcia. Garcia was the President of Houston Becnel until May 2011.

5. Prior to joining HBG Logistics, Howard and Daughtry worked for another ship husbanding agent named OBC Shipping. In 2008, OBC was bought by Gulf Agency Company. Due to disagreements with the new owner, Howard and Daughtry decided to leave OBC Shipping and start a new agency.

6. Howard and Daughtry became aware that Garcia wanted to start a ship husbanding agency. Garcia agreed to provide the start-up funds for HBG Logistics, and Howard and Daughtry would provide the husbanding agency expertise and hire other employees with such experience.

7. Plaintiffs Jo Tankers, A.S. and Jo Tankers, B.V. (collectively "Jo Tankers") are vessel operators based in Norway. Jo Tankers had previously used OBC Shipping as its husbanding agent in Houston. When Howard and Daughtry left to start HBG Logistics with Garcia, Jo Tankers decided to start using HBG Logistics as their husbanding agent in Houston.

8. As a ship husbanding agent, HBG Logistics provided services to vessels owned or operated by foreign companies such as Jo Tankers. Husbanding agents provide services such as arranging pilots and towage, clearance through Customs, Immigration and Port Authorities, line handling services, launch hire, and generally assist to fulfil other special requests of the Owner

or Operator as may be required by certain voyage or other instructions. A ship husbanding agent establishes a relationship with third party vendors that will service a vessel when in port.

9. In 2008, Jo Tankers entered into an evergreen oral agency contract with HBG Logistics, under which HBG Logistics was to provide agency services to vessels owned, managed or operated by Jo Tankers at the Port of Houston and other ports in the Gulf of Mexico. In exchange, HBG Logistics was to receive an agency fee. In the first year of the relationship, Jo Tankers' ships provided approximately 80 percent of HBG Logistics' business activities. Over time, that percentage decreased to approximately 20 percent.

10. Prior to each vessel arriving in port, HBG Logistics would submit a "Proforma Disbursement Account" or "PDA" to DA-Desk. DA-Desk is a company that provides port cost management services and essentially acts as an intermediary between the vessel owner/operator and the husbanding agent to help manage the costs associated with each port call. The PDA is essentially a request for an advance of funds by the husbanding agent from the vessel owner. The PDA would be based on the vessel, type of port call, and how long the vessel is expected to be in port, etc. It is an estimate of what expenses will be associated with the port call of the vessel.

11. DA-Desk would review the PDA and determine whether the estimate was appropriate based upon the expected conditions of the port call. If approved, Jo Tankers would advance 90 percent of the amount requested in the PDA to HBG Logistics.

12. Once a port call was completed, HBG Logistics would submit a "Final Disbursement Account" or "FDA" to DA-Desk which was a final accounting of all expenses associated with a vessel's port call. Along with the FDA, HBG Logistics would submit the invoices to support the accounting. DA-Desk would evaluate the invoices and cross reference

3

them with details from the voyage to ensure that all expenses were appropriate. Depending on whether the port call was as expected or not, the disbursement account would be settled by the payment of an existing balance or recovery of a credit.

13. The first port call of a Jo Tankers' vessel to be managed by HBG Logistics took place in mid-December 2008. HBG Logistics provided services to Jo Tankers for over a year without any noticeable problems. As time went on, Jo Tankers received notice from third party vendors that HBG Logistics was slow in paying, or was failing to pay, invoices on Jo Tankers' behalf. By the end of 2010, HBG Logistics had stopped paying third party vendors for services provided to Jo Tankers' vessels. Jo Tankers then terminated its contract with HBG Logistics in early 2011.

14. Provisions of services by the third party vendors are "necessaries" to a vessel under the general maritime law of the United States, and give rise to a maritime lien against the vessel by those third party vendors under the Commercial Instruments and Maritime Lien Act. 46 U.S.C. §§ 31301(4) and (5) and §§ 31341-31343. To avoid the arrest of their vessels and the additional expenses associated therewith, Jo Tankers was forced to pay the third party vendors directly for invoices that had been billed to HBG Logistics, even though Jo Tankers had previously forwarded money to cover these costs to HBG Logistics.

15. HBG Logistics' financial practices were very relaxed. In addition to its overhead expenses, HBG Logistics paid for client entertainment such as sporting events, hunting trips, and it also paid large sums of cash directly to its clients' ships masters while they were in port. Many of these expenditures were not accompanied by receipts or other documentation. Further, in addition to their salaries and travel expenses, some employees received additional benefits that took the form of the company paying their personal expenses. Daughtry, for example, had HBG

Logistics pay for cellular phone service for a family member, health insurance for family members and other benefits. Howard used HBG Logistics' funds to pay for an automobile and personal legal services. At various points, HBG Logistics retroactively authorized at least some or all of these employee expenditures.

16. At or about the end of 2010, Garcia reviewed the loose financial controls in place and became concerned that Howard may have misappropriated money from HBG Logistics' clients. As a result Garcia, as the sole member, fired both Howard and Daughtry as officers of HBG Logistics. Eventually, however, Howard was deemed to have been given a loan by HBG Logistics, and was rehired—this time taking a reduced salary and benefits in order to pay the loan back.

17. During the time Garcia was becoming aware of the financial problems at HBG Logistics, Keith Buford ("Buford") was an employee of LST, another company Garcia owned. Because Garcia trusted Buford, Garcia charged him with overseeing the operations of HBG Logistics. In May 2011, Buford was hired as the President of Houston Becnel.

18. Over the course of its existence, HBG Logistics operated at a substantial loss. In 2009, the net operating loss was almost $500,000. In 2010, the net operating loss was approximately $330,000. In early 2011, HBG Logistics ceased operating after posting a loss of over $120,000 for that year.

19. Howard and Daughtry always referred to their ship husbanding company as HBG Logistics. Third party vendors billed their invoices to HBG Logistics. Howard's and Daughtry's business cards indicated the company's name was HBG Logistics. Their email signatures indicated the company name was HBG Logistics. The invoices sent to Jo Tankers indicated the company name was HBG Logistics. The company checks are in the name of HBG Logistics.

However, HBG Logistics was never registered as a d/b/a with either the Texas Secretary of State or Harris County.

20. Jo Tankers never knew its husbanding agent in the Port of Houston or any other port in the Gulf of Mexico to go by the name Houston Becnel or Garcia.

## II. CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

**A. Applicable Law**

21. This suit is properly brought in diversity jurisdiction and, by virtue of the maritime contracts at issue, admiralty jurisdiction. 28 U.S.C. § 1333. The authority to interpret maritime contracts stems from the Constitution's grant of admiralty jurisdiction to federal courts—district courts maintain original jurisdiction over any civil case of admiralty or maritime jurisdiction. *Norfolk Southern Railway Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 23, 125 S.Ct. 385, 160 L.Ed 23 (2004).

22. The fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce. *Id.* To ascertain whether a contract is a maritime one, courts consider the nature and character of the contract, specifically, whether the contract references maritime services or maritime transactions. *Id.* (clarifying that a ship's direct involvement in the case is not required), *cf.* Admiralty Extension Act, 46 U.S.C. App. § 740 (46 U.S.C.S. Appx. § 740)(a ship is required in putative maritime tort cases). The "true criterion is the nature and subject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions." *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 610, 114 L.Ed. 2d 649, 111 S.Ct. 2071 (1991) (internal quotations omitted).

23. The husbanding agency contract is a maritime contract between Jo Tankers and HBG Logistics. The breach of contract claim is based on federal common law—under federal common law, the general rules of contract interpretation govern maritime contracts. *See United States ex rel. Eastern Gulf, Inc. v. Metzger Towing, Inc.*, 910 F.2d 775, 779 (11th Cir. 1990); *United States v. National Steel Corp.*, 75 F.3d 1146, 1150 (7th Cir. 1996). Jo Tanker's claims for breach of fiduciary duty, conversion, and unjust enrichment do not sound in admiralty and are based on Texas law.

**B.     Liability**

   **i.     Breach of Contract.**

24. "The essential elements of a breach of contract action are: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach." *Valero Marketing & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

25. The Court concludes that 1) there was a valid contract between Jo Tankers and HBG Logistics; 2) Jo Tankers fully performed under the contract; 3) HBG Logistics breached the contract and 4) Jo Tankers sustained substantial damages as a result of that breach.

   **ii.     Breach of Fiduciary Duty.**

26. "Inherent in any agency relationship is the fiduciary duty owed by the agent to his principal." *Hartford Cas. Ins. Co. v. Walker County Agency, Inc.*, 808 S.W.2d 681, 687 (Tex. App.—Corpus Christi 1991, no writ) (citing *Field Measurement Serv., Inc. v. Ives*, 609 S.W.2d 615, 619 (Tex. Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.); *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 769 (Tex. 1958); *Douglas v. Aztec Petroleum Corp.*, 695 S.W.2d 312, 318 (Tex.

App.—Tyler 1985, no writ). "Liability exists when the agent breaches the fiduciary duty it owes the [principal] under the agency contract, the agent owes his principal loyalty and good faith, integrity of the strictest kind, fair, honest dealing, and the duty not to conceal matters which might influence his actions to his principal's prejudice." *Hartford Cas. Ins. Co.*, 808 S.W.2d at 687-88.

27. The Court concludes that HBG Logistics breached the fiduciary duty it owed to Jo Tankers because it failed to pay the third party vendors that serviced the Jo Tankers vessels.

### iii. Conversion.

28. "The unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights, is in law a conversion." *Ojeda v. Wal-Mart Stores, Inc.*, 956 S.W.2d 704, 707 (Tex. App.—San Antonio 1997, pet. denied) (quoting *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971)). To support a claim for conversion, a plaintiff must prove: (1) plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with plaintiff's rights; (3) plaintiff made a demand for the property; and (4) defendant refused to return the property. *Id.*

29. The Court finds that HBG Logistics converted the funds advanced by Jo Tankers for its own use and benefit. Jo Tankers were the owners of those funds entrusted to HBG Logistics to pay the suppliers, pursuant to the agency contract.

30. Howard did not convert funds advanced to HBG Logistics by Jo Tankers to his own use and benefit.

31. Daughtry did not convert funds advanced to HBG Logistics by Jo Tankers to his own use and benefit.

**iv. Alter ego.**

32. It is well-established that a district court, as a court of admiralty jurisdiction, has the power to pierce the corporate veil of a defendant corporation. *Sabine Towing & Transportation Co., Inc., et al, v. Merit Ventures, Inc.*, 575 F. Supp. 1442, 1446 (E.D. Tex. 1983). Though case law has developed general rules regarding when a court should exercise its power, each case is *sui generis* and must be judged within its own context. *Id.* Furthermore, though the court may find the law of one particular state, such as Texas, persuasive, the law to be applied in such cases is federal common law. *Id.; see also Talen's Landing, Inc. v. M/V Venture,* 656 F.2d 1157 (5th Cir. 1981). With regard to the principles involved in the present case, the federal and Texas tests for piercing the corporate veil are essentially the same. *Talen's Landing, Inc.*, 656 F.2d at 1160-62 (admiralty case); *Baker v. Raymond Int'l*, 656 F.2d 173, 179-81 (5th Cir. 1981) (Jones Act and admiralty case), cert. denied, 456 U.S. 983 (1982); *National Marine Service, Inc. v. C. J. Thibodeaux & Co.*, 501 F.2d 940, 942-43 (5th Cir. 1974) (contract and admiralty case).

33. While limited liability remains the norm in American corporation law, certain equitable exceptions to the doctrine have developed. One such exception, "alter ego," arises where a parent company or a principal shareholder totally dominates and controls its subsidiary, operating the subsidiary as its agent. *See United States v. Jon-T Chemicals Inc.*, 769 F. 2d. 686, 691 (5th Cir. 1985); *see Gibraltar Savings v. L.D. Brinkman Corp.*, 860 F.2d 1275, 1290 (5th Cir.1988), cert. denied, 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 988 (1989).

34. "The alter ego doctrine and piercing of the corporate veil are truly exceptional doctrines, reserved for those cases where the officers, directors or stockholders utilized the corporate entity as a sham to perpetuate a fraud, to shun personal liability, or to encompass other truly unique situations." *Subway Equip. Leasing Corp. v. Sims (Matter of Sims)*, 994 F.2d 210, 218 (5th Cir. 1993).

35. Jo Tankers contends that HBG Logistics was the alter ego of Garcia, its sole member, and of Houston Becnel, its alleged parent corporation. In order to pierce the corporate veil under this exception to limited liability, Jo Tankers must prove both that (1) the separateness between the corporation and the shareholder or parent corporation has ceased to exist and, (2) upholding the separate corporate existence, would, under the circumstances, sanction fraud or promote injustice. *Gibraltar Savings*, 860 F.2d at 1290; *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 799 (Tex. 2002).

36. The total ownership of all the stock in a corporation or an exercise of the control that stock ownership gives to the shareholder does not mean that the corporation is the alter ego of its shareholder. *Gibraltar Savings*, 860 F.2d at 1275. Likewise, a subsidiary does not become the alter ego of its parent merely because of a duplication of some or all of the directors or officers. *Id.*; *see also BMC Software Belgium, N.V.* 83 S.W.3d at 799. Instead, the degree of control exercised must be greater than normally associated with common ownership and directorship to raise the question of whether the corporation is the alter ego of its owner. *Id.*; *Alpine View Co. Ltd. v. Atlas Copco., AB*, 205 F3d. 208, 219 (5th Cir. 2000).

37. The control necessary to invoke the doctrine of alter ego is "such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind,

will or existence of its own and is but a business conduit for its principal." *Driving Force Technologies Inc. v. Panda Inc.*, 2012 U.S. Dist. LEXIS 65696 * 3 (5th Cir. May 10, 2012).

38. The question of alter ego does not turn upon any one fact. Instead, the court must look to the totality of the circumstances when making this determination. The alter ego inquiry is meant to be flexible and fact specific and an alter ego relationship may be shown from the total dealings of the corporation and the individual. *Sabine Towing & Transportation Co., Inc.*, 575 F. Supp. at 1446. Since each case must be judged on its own facts, no set formula has been created to decide when an alter ego relationship will be found. Historically, however, courts have used some fifteen to twenty-five factors in deciding the issue. *Id.*; *Gibraltar Savings*, 860 F.2d at 1290-1291; *United States v. Jon-T Chemicals Inc.*, 769 F. 2d. at 691. The court finds that the following factors are relevant here:

> a.) *Decision-making for the subsidiary made by the parent or its principals:* Garcia and Houston Becnel are not ship husbanding agents and the business decision-making for HBG Logistics was made by Howard and Daughtry as President and Vice President of the company.
>
> b.) *The daily operations of the two corporations were kept separate:* The day-to-day operations of Houston Becnel and HBG Logistics were separate. At all relevant times, HBG Logistics was operated as a separate and legally distinct corporation from Garcia and Houston Becnel.
>
> c.) *Common or overlapping directors or officers:* Although Garcia served as the President of Houston Becnel and the Treasurer of HBG Logistics, neither Garcia nor Houston Becnel exercised any degree of control over HBG Logistics beyond that normally associated with common directorship. Garcia never exercised rights or powers regarding HBG Logistics greater than the normal rights or powers incident to his ownership as a member of HBG Logistics. Specifically, evidence of Garcia's (1) attendance at business meetings and requesting information regarding the company's finances from Daughtry and Howard and (2) providing "seed money" for the company's start up is not indicative of HBG Logistics serving as Garcia's alter ego. That fact that Buford, an employee of Garcia in another company, was charged by Garcia in late 2010 with overseeing the operations of HBG Logistics in the place of Howard and Daughtry was neither unusual nor improper under the circumstances. The fact that in draft correspondence to Daughtry, dated

January 6, 2011, Buford indicated on the signature block that he was signing the letter "On Behalf of the Board of Director,(sic) HGB Logistics, LLC," indicates that efforts were being made to observe corporate distinctions between HBG Logistics and other companies owned by Garcia. *See, e.g., Gibraltar Savings*, 860 F.2d at 1291.

d.) *Common or overlapping stock ownership:* Although there was common or overlapping stock ownership, neither Garcia nor Houston Becnel exercised any degree of control over HBG Logistics beyond that normally associated with common ownership.

e.) *Observance of formal legal requirements:* HBG Logistics observed the formal legal requirements for the existence of a limited liability corporation under Texas law. There was no complete disregard for these corporate requirements by either Garcia or Houston Becnel. While there may have been some evidence indicating a laxity of corporate documentation—such as the failure to file "doing business as" forms with the Texas Secretary of State—this is not unusual or unexpected in small corporations and, in light of the facts noted above, such evidence is not indicative of a lack of corporate legal and formal separateness. *See, e.g., Gibraltar Savings*, 860 F.2d at 1291.

f.) *The existence of common business departments:* Houston Becnel and HBG Logistics did not have a common business department.

g.) *Whether the subsidiary receives any business except that given to it by the parent.* There was a clear difference and division in the business activities of Garcia and Houston Becnel and those of HBG Logistics. Houston Becnel is a customs agency and HBG Logistics was a ship husbanding agency. There was no evidence that Houston Becnel was the sole or principal source of business for HBG Logistics.

h.) *The use of the same corporate office:* There was a clear difference in the offices of Garcia and Houston Becnel and those of HBG Logistics. Although HBG Logistics and Houston Becnel had offices in the same warehouse facility, the property was very large. HBG Logistics and Houston Becnel occupied different office space in the warehouse and had separate entrances into their office space. The two companies had different telephone numbers, telephone systems and mailing addresses. There was also different signage for HBG Logistics and Houston Becnel at the warehouse. HBG Logistics and Houston Becnel had only one employee in common, and half of that employee's salary was paid by Houston Becnel while the other half was paid by HBG Logistics. HBG Logistics and Houston Becnel also had different pay accounts and each company paid its own bills. HBG Logistics' office furnishings were almost entirely provided by investment funds provided by Garcia, as a member, and HBG Logistics paid rent to Houston Becnel for its office space. Each company was responsible for hiring and firing its own employees.

i.) *The existence of common business deposits:* Garcia, Houston Becnel and HBG Logistics did not have common business deposits. Separate financial records were maintained for HBG Logistics. HBG Logistics maintained a separate bank account and its property and assets were not indiscriminately commingled with the property and assets of either Garcia or Houston Becnel.

j.) *The filing of consolidated financial statements and tax returns:* Garcia and Houston Becnel did not file consolidated financial statements or tax returns with HBG Logistics.

k.) *Whether the parent finances the subsidiary:* HBG Logistics had an agreement with Houston Becnel regarding its use of Houston Becnel's line of credit. HBG was to use this line only for cash shortfalls and was to repay all sums used and reimburse Houston Becnel for the bank service charge for using the credit line. This use of the credit line by HBG Logistics, in the absence of evidence establishing Houston Becnel's control and domination over HBG Logistics' business activities, is not indicative of a lack of corporate legal and formal separateness. Likewise, Garcia's conduct in investing in HBG Logistics did not exceed those actions normally associated with stock ownership or membership in a Texas Limited Liability Corporation. Garcia's investment in HBG Logistics is not indicative of a lack of corporate legal and formal separateness between Garcia and HBG Logistics.

l.) *Inadequate capitalization of the subsidiary:* HBG Logistics was not undercapitalized for the business that it was engaged in. Garcia invested over $50,000 to operate this company.

m.) *Whether parent pays the salaries and other expenses of the subsidiary:* Houston Becnel was not responsible for and did not pay the salaries and other expenses of HBG Logistics.

n.) *Whether parent company exists solely as a holding company for its subsidiary:* Houston Becnel did not exist solely as a holding company for HBG Logistics.

o.) *Whether parent uses the subsidiary's property as its own:* Garcia and Houston Becnel did not improperly use HBG Logistics property as their own. HBG Logistics paid Houston Becnel a fee for the use of its customs bond in its business operations. This was not uncommon in the ship husbanding business.

p.) *The existence of injustice to third parties:* Justice does not require a finding of alter ego liability in this case. Nor does a finding of no alter ego sanction any kind of fraudulent conduct by either Garcia or HBG Logistics. Jo Tankers was in no way confused about Garcia or Houston Becnel's formal distance from, and lack of legal liability for, the conduct of HBG Logistics when it entered into the evergreen agency agreement with HBG Logistics.

39. Garcia did not totally dominate and control HBG Logistics as its agent or business conduit.

40. Houston Becnel did not totally dominate and control HBG Logistics as its agent or business conduit.

41. Upholding the separate corporate existence of HBG Logistics would not, under the circumstances of this case, sanction fraud or promote injustice.

42. HBG Logistics is not the alter ego of Garcia.

43. HBG Logistics is not the alter ego of Houston Becnel.

**C.    Damages**

    **i.    Breach of Contract.**

44. The Court concludes that Jo Tankers is entitled to and shall recover damages in the amount of **$439,691.52 plus prejudgment interest** from HBG Logistics.

45. The Court concludes that Jo Tankers is not entitled to and shall not recover any sums from Garcia.

46. The Court concludes that Jo Tankers is not entitled to and shall not recover any sums from Houston Becnel.

47. The Court concludes that Jo Tankers is not entitled to and shall not recover any sums from Howard.

    **ii.    Breach of Fiduciary Duty.**

48. The Court concludes that Jo Tankers is entitled to and shall recover damages in the amount of **$439,691.52 plus prejudgment interest** from HBG Logistics.

49. The Court concludes that Jo Tankers is not entitled to and shall not recover any sums from Garcia.

50. The Court concludes that Jo Tankers is not entitled to and shall not recover any sums from Houston Becnel.

51. The Court concludes that Jo Tankers is not entitled to and shall not recover any sums from Howard.

### iii. Conversion.

52. The Court concludes that Jo Tankers is entitled to and shall recover damages in the amount of **$439,691.52 plus prejudgment interest** from HBG Logistics.

53. The Court concludes that Jo Tankers is not entitled to and shall not recover any sums from Garcia.

54. The Court concludes that Jo Tankers is not entitled to and shall not recover any sums from Houston Becnel.

55. The Court concludes that Jo Tankers is not entitled to and shall not recover any sums from Howard.

### iv. Damages from Howard and Daughtry.

56. The Court concludes that HBG Logistics is not entitled to contribution from Howard.

57. The Court concludes that HBG Logistics is not entitled to contribution from Daughtry.

58. The Court concludes that HBG Logistics shall not recover any sums from Howard.

59. The Court concludes that HBG Logistics shall not recover any sums from Daughtry.

Any of the foregoing findings of fact that contains conclusions of law shall be deemed to be conclusions of law, and any of the foregoing conclusions of law that contain conclusions of fact shall be deemed to be findings of fact.

**IT IS SO ORDERED.**

**SIGNED** AT **HOUSTON, TEXAS**, on January 8, 2013.

*[signature]*
GEORGE C. HANKS, JR.
**UNITED STATES MAGISTRATE JUDGE**